# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MASSACHUSETTS
# EASTERN DIVISION

| | |
|---|---|
| In re<br><br>ERIN G. KENNEALLY,<br>  a/k/a ERIN K. HUGHES,<br><br>                    Debtor<br>_____<br><br>THOMAS A. BOLTON, AS ASSIGNEE OF<br>  CONN KAVANAUGH ROSENTHAL<br>  PEISCH & FORD, LLP,<br><br>                    Plaintiff<br><br>v.<br><br>ERIN G. KENNEALLY, a/k/a<br>  ERIN K. HUGHES,<br><br>                    Defendant | Chapter 7<br>Case No. 11-22021-FJB<br><br><br><br><br><br>Adversary Proceeding<br>No.  12-1074 |

## MEMORANDUM OF DECISION

By his complaint in this adversary proceeding, plaintiff Thomas Bolton, as assignee for purposes of collection of a claim belonging to the law firm of Conn Kavanaugh Rosenthal Peisch & Ford, LLP ("CKRPF"),[1] of which he is the controller, seeks a determination that the debt for legal fees owed to the firm for its representation of the defendant and debtor, Erin G. Kenneally, a/k/a/ Erin K. Hughes ("Kenneally"), during the latter's divorce proceeding is excepted from discharge.  CKRPF contends that the debt is excepted from discharge under 11 U.S.C. § 523(a)(2)(A) as a debt arising from false representations and false pretenses and under 11 U.S.C.

---

[1] Though the complaint is brought in the name of Bolton, he is here for CKRPF, and therefore I will refer to the plaintiff throughout as CKRPF or "the Firm."

§ 523(a)(6) as a debt for willful and malicious injury to CKRPF.  As the gravamen of both counts, CKRPF alleges that Kenneally made a false promise of payment to the firm, a promise to pay the firm's fees that she had no intent to honor, in reliance on which the firm was injured by expenditure of time and effort without compensation.  After a two-day trial, the Court now makes the following findings and rulings and, on the basis thereof, concludes that CKRPF has established cause to except the debt from discharge under 11 U.S.C. § 523(a)(2)(A).

**Procedural History**

Kenneally filed a petition for relief under chapter 7 of the Bankruptcy Code on December 30, 2011.  In due course she received a discharge under 11 U.S.C. § 727(b), and the chapter 7 trustee has filed a report of no distribution.  Before entry of discharge, Thomas Bolton, as assignee for collection purposes of a claim belonging to CKRPF, timely filed the complaint commencing this adversary proceeding.   The complaint seeks an adjudication of Kenneally's liability to the Firm for attorney's fees and expenses and a determination under subsections (a)(2)(A), (a)(2)(B), and (a)(6) of 11 U.S.C. § 523 that the debt is excepted from discharge.  On June 3, 2012, the court entered an order abstaining under 28 U.S.C. § 1334(c)(1) (discretionary abstention) from adjudication of the portion of the complaint that requests a determination of liability, leaving only the nondischargeability counts.  At trial, CKRPF clarified that it is no longer proceeding under subsection (a)(2)(B).[2]

**Findings of Fact**

This adversary proceeding concerns CKRPF's representation of Kenneally in divorce proceedings commenced in late 2009 and the legal fees that accrued in the course thereof.

---

[2] In the "Wherefore" clause of its complaint, the Firm demands a determination of nondischargeability under subsection (a)(4), but the reference to subsection (a)(4) appears to be a typographical error.  The complaint includes no count under that subsection, and the Firm has advanced no arguments under it.

2

Kenneally retained CKRPF on or about November 6, 2009 by entering into a written representation agreement of that date with the Firm (the "Agreement").  In the Agreement, the Firm agreed to represent Kenneally in her divorce proceeding, including on issues of alimony, division of property, and child support, in exchange for which Kenneally agreed and thereby promised to compensate the Firm for its attorneys' services on an hourly basis, at specified rates, and for its disbursements.  "The Client agrees to assume and shall be responsible for payment of all fees for legal services, and expenses/disbursements [.]"  Agreement, pp. 4-5.  In the Agreement, Kenneally further agreed to pay the firm a retainer of $10,000, and, upon retention, she did pay the Firm this amount as a retainer.  The Agreement specified that fees and disbursements would first be deducted from the retainer and that, after exhaustion of the retainer, the Firm, at its option, could require the client to renew the retainer or, if no further retainer were required, institute monthly billing, with payment to be made promptly on receipt. Kenneally also acknowledged in the Agreement that "the total charge for legal services and disbursements is presently unascertainable" and that "no results have been guaranteed by the Firm to the Client and that this Agreement is not based upon any such promises or anticipated results."

At the time she entered into the Agreement, both Kenneally and CKRPF understood that Kenneally's ability to pay was limited.  She had little income and no liquid assets and had funded the Firm's retainer with a $10,000 loan from her parents.  However, both parties also expected that as part of the divorce, the marital home would be sold and that, upon its sale, Kenneally's share of the proceeds would enable her to pay some or all of the fees that would by then accrue.  Kenneally conceded that she promised to use the proceeds to pay what she was then able to pay:  "yeah, I promised that when the house sells we'd take what we can and do what

we can."[3]  And the Firm, for its part, said: "don't worry about it, you've got the money in the house; when the house sells, we'll take care of it."[4]  Kenneally did not give the Firm a mortgage on the home or other lien to secure payment, and the Firm did not request a consensual lien to secure Kenneally's promise.  Nor did the Firm ever take steps to obtain a lien involuntarily or insist on payment from other sources.[5]  CKRPF relied on Kenneally's promise of payment from the sale proceeds by entering into the Agreement and, over the following ten months, by providing services and disbursements on her behalf totaling $42,706.30 in value, $32,706.30 in excess of the retainer.  In so relying, the Firm had no reason to doubt the sincerity of Kenneally's promise, that she intended to honor the promise to pay to the best of her ability.  The Firm's reliance was justified.

Over the course of the representation, Kenneally, through the firm, and her husband, through his counsel, negotiated a separation agreement (the "Separation Agreement") that they entered into on August 10, 2010.  Also on August 10, 2010, a judgment of divorce nisi entered in the divorce action, which judgment incorporated the Separation Agreement.  In relevant part, the Separation Agreement provided:  (i) that the marital home would be marketed and sold and that, after payment of certain specified items, its net proceeds would be divided equally between husband and wife; (ii) that Kenneally would serve as a listing agent for marketing and sale of the home; (iii) that upon sale of the home, each party was to direct the closing attorney to prepare a check for that party's 50 percent share "payable to each party through their respective counsel," (iv) that the couple would share legal custody of their two minor children,

---

[3] Transcript, p. 30.
[4] Id.
[5] During the divorce proceeding, Kenneally received proceeds from the liquidation of another marital asset, a vacation home, and from insurance coverage for the fire.  Though these funds were channeled to Kenneally through the Firm, the Firm did not ask Kenneally to use these funds for payment of its outstanding fees.  Kenneally needed the funds for her family's support.  The Firm, in recognition of this need and in reliance on Kenneally's promise of payment from the later sale of the residence, was content to accommodate her and wait for payment from the promised proceeds of the residence.

4

but that Kenneally would have physical custody of the children, who would reside primarily with her, and (v) that each party waived all past and present, but not future, alimony. Kenneally's waiver of alimony was driven principally by the fact that, at the time of the Separation Agreement, the husband had been unemployed since 2008 and had no stream of income with which to fund alimony payments. By separate order then in effect, the ex-husband was also required to pay child support to Kenneally in the amount of $210 per week.

Over the course of the representation, CKRPF sent invoices to Kenneally monthly. As the invoices showed, the $10,000 retainer was exhausted by late February, 2010. The Firm did not then ask her to renew the retainer. Though the balance due increased monthly from February through October 2010 to $32,706.30, Kenneally made no payment during this period. Notwithstanding the Agreement's requirement of payment upon receipt, the Firm did not insist on payment during this period and, notwithstanding Kenneally's nonpayment of the balance, continued to render service to her through October. By this time the divorce proceeding was concluded and counsel's attention had turned to possible modification of the husband's child support obligation. The Firm's representation of Kenneally ended in October 2010. Also in October 2010, Carolyn Van Tine, the attorney at CKRPF that had been principally staffing Kenneally's case, left the Firm.

Kenneally and her husband first listed their home for sale on September 8, 2009; the original asking price was $729,000, which two weeks later they lowered to $699,000. At some point thereafter, the home and a great deal of personalty in it were lost in a fire. With insurance proceeds, Kenneally and her husband rebuilt the house. In November 2010, after obtaining three different opinions of value, they listed it again for sale, first at $599,000 and then at $584,900. The house went under agreement on April 29, 2011 and finally was sold on June 17, 2011 for $570,000. On or around the sale date, Kenneally received from the proceeds of the

sale some $57,600, including $44,000 for her 50 percent share of the net proceeds[6] and an additional $13,600 as a commission for being the listing agent on the sale.

After October 2010, Kenneally communicated twice with Attorney Van Tine, who had moved from CKRPF to another firm.  In January 2011, Kenneally called Van Tine to state that her ex-husband had become employed and to ask what she should do about it.  Van Tine advised her to file a complaint for modification to obtain an increase in child support and, if the salary was high enough, an award of alimony.  The second communication occurred when Van Tine learned through Facebook that Kenneally's house was under agreement but before the house had sold.  They talked about the fact that the Separation Agreement called for her share of the proceeds to be cleared through CKRPF.  Kenneally told her that if the money went to the Firm, she'd be left with nothing.  Van Tine told her she should call the Firm to offer to make partial payment and work out an arrangement for the balance.  Kenneally told her she would do so and asked Van Tine *not* to communicate with CKRPF about this issue herself; out of a sense of duty to Kenneally as her former client, Van Tine did not communicate with CKRPF about this conversation or the pending sale.  Kenneally had no subsequent communications with Van Tine. With respect to child support and alimony, Kenneally, acting prose, filed a complaint for modification and obtained an interim order increasing the weekly child support payments to $517 pending final adjudication of the complaint.  Before the final hearing, she sought the assistance of legal counsel and, to that end, hired not CKRPF or Van Tine but other counsel.

After October 2010, Kenneally had no further communication with CKRPF. Notwithstanding her assurance to Van Tine, she never informed the Firm that her house had gone under agreement or that it had sold.  She did not arrange for the closing attorney to have her share of the proceeds channeled through the Firm (or any other attorney).  She made no

---

[6] The documentary evidence accounts for distribution to her of only $38,909, but Kenneally testified that she received one-half of the net proceeds of $88,000, or $44,000.

payment, full or partial, to the Firm from the proceeds and earnings she received upon sale of the house; and she did not attempt to work out an alternative payment arrangement with the Firm.  Rather, not long after the sale of the home, she met for the first time with the attorney who eventually filed her bankruptcy petition on her behalf.  She contends that the purpose of the retention, at that time, was not to seek bankruptcy relief but to help her in dealing with her debt, especially her debt to the Firm.  She has offered no evidence to corroborate this limitation in the retention.  In late July 2011, and at Kenneally's request, the Firm forwarded to her attorney its billing records for Kenneally's account.  Receiving no payment from Kenneally, CKRPF filed suit against her in the Superior Court Department of the Trial Court of the Commonwealth of Massachusetts on December 27, 2011.  Three days later, Kenneally filed her petition for bankruptcy relief.  The Firm's claim against her is two-thirds of the debt she lists on her schedules and seeks to discharge in this case.  But for her desire to obtain a discharge of her debt to CKRPF, it is unlikely that she would have sought bankruptcy relief.

Kenneally contends that it was not until the third day after the sale of the home that she decided to dishonor her promise of payment to CKRPF and to keep the proceeds for her own purposes.  That third day was the date of the final hearing on her petition to increase her ex-husband's child support payments, by which petition she also sought an award of alimony.  The Probate Court did increase the support obligation to $510 per week but denied her request for alimony.  She states that the denial of alimony made her realize that the proceeds of the sale were all she had left.  She testified that at least as late as the August 2010 signing of the Separation Agreement, she had intended to pay CKRPF's fees from the sale proceeds.   She later changed her mind, she contends, for essentially three reasons:  first, "I didn't get out of the divorce everything that I had been led to believe that I would"; second, the house sold for some $130,000 or $140,000 less than what she and her husband had originally hoped for; and third,

7

"what it cost me to move and set up a little tiny house for my kids and I to live in was the final straw." Elaborating on the last reason, she said: "I had to put my kids and myself and my family first. And what was left, that was when I changed my mind, that was when I said I cannot do this. I have nothing after this."

CKRPF takes the position that Kenneally's nonpayment of the debt and election to seek its discharge in bankruptcy reflected not a change of mind but her original intent. The Firm alleges that Kenneally never intended to pay the balance, that her promise of payment was at best subject to unstated conditions—relating to the adequacy of her financial situation at the time of the sale—and made, in essence, with her fingers crossed behind her back. Consistent with this position, CKRPF maintains that the reasons advanced for her alleged change of mind are false pretenses designed to make her breach of promise appear to be the result of changed circumstances and not the result of her original intent.

CKRPF bears the burden of proving that Kenneally made her promise of payment without intent to honor it. For the reasons articulated below, I find by a preponderance of the evidence that Kenneally made her promise of payment without intent or commitment to honor it.

   i.    **Ability to Pay**

First, when she received the sale proceeds, Kenneally had the financial wherewithal to pay CKRPF in full. The proceeds, including her sales commission, exceeded the balance due by some $25,000. At the time, Kenneally had been employed for some time at a salary of $50,000 per year, and she was receiving child support from her husband, tax free, at the rate of $517 per week. The evidence also shows that, although she used some of the sale proceeds to pay debts immediately and to move her family and get established in new rental quarters, she also retained a substantial portion, approximately $30,000, as savings for future contingencies.

8

Therefore, she not only had the funds to make the payment, but she had the wherewithal to make the payment without leaving herself destitute. She could certainly have funded a substantial partial payment. She was not unable to honor her promise of payment; as she virtually concedes, she *chose* not to honor it. A promise is, by nature, a commitment, and the failure to honor that commitment by one having the ability to honor it is itself evidence that the promise was false (albeit not dispositive on that issue).

    **ii.**    **Reasons for Alleged Change of Mind**

Second, the reasons Kenneally cites for her alleged change of mind ring hollow. She says first that she didn't get out of the divorce everything that she had been led to believe that she would get. By this, and from other arguments she has advanced, I understand her to mean two things: (i) that the Firm promised her more than it delivered, such that she was justified in her nonpayment, and (ii) that she made the promise of payment with financial expectations (whether justified or not) that were quite different from the way things turned out. Neither is supported by the evidence.

I find it unlikely, and certainly not supported by the weight of the evidence, that her attorney would have promised that she would receive items that her settlement did not include: alimony, insurance coverage, a richer division of property (based primarily on her belief that her husband had used a $500,000 inheritance for his own separate purposes). In her Agreement with the Firm, she expressly acknowledged that no specific result had been promised. She nonetheless contends that Attorney Van Tine promised her alimony, but Van Tine very credibly denies this and points out that the husband was unemployed at the time and had been for some time, that the availability of alimony turns in large measure on the extent of income, and that she explained this to Kenneally and would never have promised alimony at all, much less where the amount of future income was as yet unknown. Kenneally also says she was promised a

9

richer property settlement, but this too is unsupported, highly improbable, and contrary to Van Tine's credible testimony. Kenneally also complains that CKRPF's attorneys did not adequately research the "disappearance" of the $500,000 inheritance, but, as Van Tine testified, they did account for expenditure of the funds in question, and Kenneally has offered no evidence that the husband had hidden assets or expenditures that, timely brought to light, might have altered the outcome. In addition, the record contains no evidence that Kenneally voiced dissatisfaction with the Firm's services until after she defaulted on her payment obligation and the Firm insisted on payment; to the contrary, the evidence shows her to have been on friendly terms with her attorrney's. For these reasons, I find Kenneally's allegation—that the Firm made promises of results it failed to deliver or otherwise failed to represent her in a satisfactory manner—to be false and not a reflection of her true belief, a false pretense.

      Nor do I credit Kenneally's contention that, whether justifiedly or not, she made her promise of payment with an expectation of a much richer result than she finally obtained. When she retained the Firm and made her promise of payment, her husband, who had had a history of significant earnings, had nonetheless been unemployed for some time. She herself had very little income. The family had been living off of its savings for a year. The economy was in a severe recession that depressed the real estate market and her and her husband's employment and salary prospects. She had just had surgery, and her home had suffered extensive fire damage. Before the fire, they had put their house on the market and, almost immediately, had lowered the asking price by $30,000 to $699,000, where it had languished for two months before being removed from the market because of the fire. Perhaps she still expected the house to sell for $670,000, but even this amount was far from certain. It is in any event disingenuous to suggest that, upon her retention of CKRPF, she expected the property to sell for over $700,000. And although she apparently believed her husband had hidden or

expended assets from an account in which they held an inheritance he had received, all she really knew at that time was that the account in question was empty.  For these reasons, I find that, though she may have *hoped* for a richer result, she cannot have expected a richer result with any certainty.  And her financial situation at the time of sale was, though no doubt disappointing and difficult, hardly unforeseeable or even improbable.  It was not inconsistent with what she must have and, I find, did expect to be well within the range of possibility.

Kenneally also contends that the last straw was "what it cost me to move and set up a little tiny house for my kids."  This contradicts her testimony that the last straw was the denial of alimony.  And the contradiction places in question the credibility of both averments.

### iii.     Equivocal Promise

In testifying about her promise to pay CKRPF from the proceeds of the sale, Kenneally equivocated about what she promised.  On the one hand, she conceded that she promised, albeit very informally, that "when the house sells, we'd take what we can and do what we can," and that the Firm continued to render service after exhaustion of the retainer on the understanding, of which she knew and did not disabuse the Firm, that "when the house sells, we'll take care of it."[7]  On the other hand, Kenneally also strenuously maintained that she didn't promise payment from the proceeds but only "intended" and hoped "to *be able to* pay."[8] CKRPF's counsel asked Kenneally at trial:

> Q:  Again, I'm getting into your thinking -- not when the house
> sold but back in the beginning -- when the house sells, it was --
> your thinking was it was you who was going to decide how
> much you could pay based upon what the circumstances were;
> is that right?[9]

---

[7] Transcript, p. 30.
[8] Transcript, p. 33 (emphasis added).
[9] Transcript, pp. 34-35.

11

Tellingly, Kenneally's response was not a denial but "not exactly. . . . It's not what I was thinking at the time. What I was thinking at the time was that there would be money that would be more significant that it was."[10] She maintains both that she promised payment from the proceeds *and* that she didn't really promise payment, only hoped to be able to pay. And, by this testimony, as confirmed by her nonpayment, she has shown that any intent she may have had to pay from the proceeds was subject to reservations and contingencies—not shared with CKRPF—about the adequacy, in her own judgment, of her financial picture at the time of the closing. In her mind, notwithstanding her outward unqualified promise, payment was discretionary, not something to which she had committed herself.

      iv.      **Contemplation of Bankruptcy**

In an email to her attorneys at CKRPF dated July 27, 2010, approximately two months before the representation ended, Kenneally asked, "Should I be looking into filing bankruptcy? Seriously . . . it makes me sick to think about it, but it sure does feel like a reality at this point." The email shows that, even while she was continuing to accrue debt to CKRPF, she was—and had been for some unspecified time—contemplating a bankruptcy filing and discharge of the accruing debt in bankruptcy. This places in question the veracity of her testimony that, as of the date of the Separation Agreement in August 2010, she intended to honor her promise of payment. It also lends support to CKRPF's contention that the dishonor of her promise was not the result of a late change of mind but consistent with her intention from the start.

For these reasons, the evidence preponderates in favor of the conclusion that, as CKRPF alleges, the promises of payment that Kenneally articulated at the beginning of her relationship with the Firm and later, when the retainer was exhausted, were false because they were made without commitment to honor them. Instead, Kenneally reserved to herself the prerogative of

---

[10] Transcript, p. 35.

determining, in light of her financial condition upon sale of the home, whether she would pay the balance.  This reservation was not part of her agreement with the Firm and, as Kenneally was well aware, was not known to the Firm.   The promises of payment were made with knowledge of their falsity, intent to deceive, and intent to induce reliance.

**Jurisdiction**

The matter before the court is a complaint under 11 U.S.C. § 523(a) to determine the dischargeability of a debt.  The matter arises under the Bankruptcy Code and in a bankruptcy case and therefore falls within the jurisdiction given the district court in 28 U.S.C. § 1334(b) and, by a standing order of reference,[11] referred to the bankruptcy court pursuant to 28 U.S.C. § 157(a).  It is a core proceeding within the meaning of 28 U.S.C. § 157(b)(1).[12]  The bankruptcy court accordingly has authority to enter final judgment.

**Discussion**

a.      **Positions of the Parties**

Bolton argues that Kenneally's debt to CKRPF for legal fees is a debt that arose from false representation and false pretenses: specifically, false promises of payment, made at the commencement of the relationship and later when the retainer was exhausted, and later repeated pretenses of intent to pay.  Bolton further contends that Kenneally made the promises and assurances with knowledge of their falsity and with intent to deceive and induce reliance, that CKRPF did rely on them by performing legal services and incurring expenses, and that CKRPF was injured by Kenneally's ultimate failure and refusal to pay.  CKRPF contends that Kenneally has shown herself in testimony to be dishonest and untrustworthy, denying

---

[11] The order of reference is codified in the district court's local rules at L.R. 201, D. Mass.
[12] See 28 U.S.C. § 157(b)(2)(I) (core proceedings include proceedings to determine the dischargeability of a particular debt).

13

responsibility for the balance due, which CKRPF construes as proof that Kenneally never intended to honor her promise of payment.

Kenneally contends that she did not make a false representation to CKRPF. When she entered into the retainer agreement with CKRPF, she intended to pay. Kenneally argues that when the marital home was finally sold, her financial circumstances were far less healthy than she had imagined, hoped, and believed they would be when she had initially retained CKRPF. Her decision not to use the sale proceeds to pay CKRPF was not the result of an original intent to stiff the firm but instead was based on her financial circumstances at the time of the sale.

b.    **Applicable Law**

1.    **Section 523(a)(2)(A): False Pretenses, False Representation, or Actual Fraud**

CKRPF seeks a determination that the legal fees incurred in representing Kenneally in her divorce are excepted from discharge under 11 U.S.C. § 523(a)(2)(A). In furtherance of the Bankruptcy Code's 'fresh start' policy, exceptions to discharge are narrowly construed. *Palmacci v. Umpierrez*, 121 F.3d 781, 786 (1st Cir. 1997). The burden falls upon CKRPF, as the party asserting an exception from discharge, to prove that the debt comes squarely within an exception enumerated in 11 U.S.C. § 523(a); and it must prove its case by a preponderance of the evidence. *Grogan v. Grogan*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991 (preponderance of the evidence standard applies to all exceptions from dischargeability in § 523(a)); *Palmacci* at 787.

Section 523(a)(2)(A) of the Bankruptcy Code excepts from discharge any debt for an extension of credit obtained "by false pretenses, a false representation, or actual fraud[.]" 11 U.S.C. § 523(a)(2)(A). CKRPF uses the terms "false representation," "false pretenses," and "fraud" interchangeably in its complaint, but the complaint and request for rulings of law focus only an alleged false representation and false pretenses. The alleged false representations are

14

false promises to pay, promises made without intent to honor them, made at the commencement of the representation and when the retainer was exhausted.

The First Circuit has established the elements that must be shown in order to establish that a debt is nondischargeable because it was obtained by a false representation. A creditor must show that: "(1) the debtor made a knowingly false representation;[13] (2) the debtor intended to deceive; (3) the debtor intended to induce the creditor to rely upon the false statement; (4) the creditor actually relied upon the misrepresentation; (5) the creditor's reliance was justifiable; and (6) the reliance upon the false statement caused damage." *McCrory v. Spigel* (*In re Spigel*), 260 F.3d 27, 32 (1st Cir. 2001) citing *Palmacci*, 121 F.3d at 786; *In re Burgess*, 955 F.2d 134, 139 (1st Cir. 1992) (as to elements other than reasonableness or justifiability of reliance). To determine whether a debtor made a knowingly false representation, I have to look at the time the debt was incurred.

> If, at the time [the debtor] made a promise, the debtor did not *intend to perform*, then he has made a false representation (false as to his intent) and the debt that arose as a result thereof is not dischargeable (if the other elements of § 523(a)(2)(A) are met). If he did so intend at the time he made his promise, but subsequently decided that he could not or would not so perform, then his initial representation was not false when made.

*Palmacci*, 121 F.3d at 786-87. The debtor's intent to deceive need not be proven by direct evidence but may be inferred from the totality of circumstances. *Palmacci*, 121 F.3d at 789. For purposes of determining whether reliance was justified, "the circumstances of the reliance claim must be taken into account," and "the individual is not obliged to investigate statements made to him (although he cannot shut his eyes to an obvious falsehood)." *Lentz v. Spadoni (In re Spadoni)*, 316 F.3d 56, 59 (1st Cir. 2003). Where the exception is based on a false pretense, the

---

[13] Instead of a false representation made knowingly, a creditor can prove a false representation made in reckless disregard of its truth. *McCrory v. Spigel (In re Spigel)*, 260 F.3d at 32. There is no allegation here of reckless disregard.

15

requirements are largely the same, except that the requirement of a false representation is replaced by a requirement of a false pretense, which is an implied misrepresentation or a false impression created by conduct of the debtor. *Merchants National Bank of Winona v. Moen (In re Moen)*, 238 B.R. 785, 791 (B.A.P. 8th Cir. 1999); *Sun Trust Bank v. Brandon (In re Brandon)*, 297 B.R. 308, 313 (Bankr. S.D.Ga. 2002)(as distinguished from false representation, which is an express misrepresentation, false pretense involves an implied misrepresentation or conduct intended to create and foster a false impression).

There are no disputes of law here, only disputes of fact concerning three elements: a knowingly false representation, intent to deceive, and actual reliance. CKRPF alleges (i) that Kenneally made a promise to pay any fees and expenses incurred in excess of the $10,000 retainer and a further promise to make this payment from the proceeds from the sale of the marital home and (ii) that she made these promises without intent or commitment to honor them, reserving for herself the unstated prerogative of paying as she saw fit in light of her then-existing financial circumstances. In closing arguments, Kenneally, through counsel, admitted that she promised payment, denies that she promised payment specifically from the marital home, but concedes that she at least promised payment from liquidation of the marital estate in general. She denies that when she made the promises, she lacked intent to honor them; she maintains that she decided to dishonor her promise only later, in light of the financial circumstances in which she then found herself, which she maintains she had not anticipated.

On the basis of the findings of fact set forth above, I find by a preponderance of the evidence as follows. Kenneally did promise to pay CKRPF for the services of its attorneys and for its expenses. She also promised to make this payment from the proceeds of the marital home, upon its sale. In making these promises, however, she tacitly but consciously reserved to herself the prerogative of paying as she saw fit in light of her then-existing financial circumstances. I do

16

not find that, when she made the promises, she had resolved not to pay—the evidence suggests that she did not decide whether she would pay until much later. I do find that, notwithstanding her outward promises, she had not, when she made her promises, resolved *to* pay, had made no internal *commitment* to pay. As a promise is a commitment, her lack of commitment, resolve, and intent to pay rendered the promise false, a false representation of her intent and state of mind. "[A] promise made with a positive intent not to perform *or without a present intent to perform* satisfies § 523(a)(2)(A)." *Rubin v. West (In re Rubin)*, 875 F.2d 755, 759 (9th Cir. 1989) (emphasis added). She made this false representation with knowledge of its falsity, knowledge that the Firm was unaware of her inward reservation, and intent to deceive and induce reliance.

The Firm did actually rely on these false promises by rendering services to her and electing not to insist on payment from other assets as a condition of continuing its service. The fact that the Firm did not take or insist on a mortgage on the home to secure its claim does not prove lack of reliance; rather it shows precisely that the Firm relied on the promise itself and nothing else. The reliance was justifiable; Kenneally does not contend that the Firm had reason to doubt the veracity of her promises.[14] And that reliance caused the Firm to render services and make expenditures on Kenneally's behalf, the services and expenditures that form the basis of its claim; but for these promises, the Firm would not have rendered the service and expenditures that gave rise to the debt. Accordingly, I conclude that the debt to the Firm,

---

[14] In her proposed findings and conclusions, Kenneally argues that the Firm's reliance was not *reasonable*. The law, however, is clear that 523(a)(2)(A) does not require proof that the creditors' reliance was reasonable, only that it was justifiable, a lesser standard. *Field v. Mans*, 516 U.S. 59, 73-74, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). Kenneally makes no attempt to defend application of a reasonableness standard; rather, in the recitation of the law in her proposed conclusions, she correctly identifies the standard of reliance as justifiable.

including any interest thereon, and any costs and attorney's fees that may be awarded for its collection, are excepted from discharge under § 523(a)(2)(A).[15]

### 2. Section 523(a)(2)(6): Willful and Malicious Injury

Section 523(a)(6) excepts from discharge debts "for willful and malicious injury by the debtor to another entity or to the property of another entity." The gravamen of this count is the same as that of CKRPF's count under § 523(a)(2)(A): damages resulting from Kenneally's misrepresentation of her intent to pay the Firm's bills with the proceeds of the marital home. Where the basis for a claim under § 523(a)(6) is precisely the same as a false representation within the scope of § 523(a)(2)(a), the more specific requirements of subsection (a)(2)(A) displace those of (a)(6), such that the latter does not here supply a possible alternate statutory basis of nondischargeability. *Berkson v. Gulevsky (In re Gulevsky)*, 362 F.3d 961, 963-64 (7th Cir. 2004) (the subsections of § 523 should not be construed to make others superfluous, and when both a specific and a general provision govern a situation, the specific one controls). Accordingly, the Court need conduct no separate analysis under (a)(6).

**Conclusion**

For the reasons set forth above, the Firm is entitled under § 523(a)(2)(A) to a declaration of nondischargeability. Judgment will enter accordingly.

Date: May 24, 2013

_____
Frank J. Bailey
United States Bankruptcy Judge

---

[15] In so ruling, I rely only on the promises of payment as false representations. The Firm also requests judgment on the basis of "false pretenses," but it has not separately briefed the issue of pretenses and has failed to specify conduct that might constitute the pretenses on which it is relying. Its operative facts are the express promises of payment, which are representations, not pretenses.